**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Camille Herron,

Plaintiff,

v.

Gripped Publishing Incorporated,

Defendant.

No. CV-26-00003-TUC-RM

**ORDER**

Pending before the Court is Defendant Gripped Publishing Incorporated's Motion to Dismiss. (Doc. 5.) Plaintiff Camille Herron responded (Doc. 10), and Defendant filed a reply in support of its Motion (Doc. 11). For the following reasons, the Court will grant Defendant's Motion to Dismiss.

## I. Background

Defendant removed this action from Pima County Superior Court on January 2, 2026, invoking the Court's diversity jurisdiction (Doc. 1), and filed the currently pending Motion to Dismiss on January 9, 2026 (Doc. 5). Defendant is a Canadian corporation that operates an online publication called "Canadian Running Magazine," which reports on the sport of running. (Doc. 1-7 at 3.) Plaintiff is a highly successful professional ultrarunner; she holds multiple world records related to ultrarunning and is a 2024 inductee into the Road Runners Club of America Distance Running Hall of Fame. (Doc. 10-1 at 2.) Defendant has consistently covered Plaintiff's ultrarunning career, publishing around thirty articles about her since approximately 2012. (*Id.*) The editor of Gripped Publishing, Anne

Francis, has reached out to Plaintiff to obtain her comments for various articles, with Plaintiff proffering five examples of emails from Ms. Francis between January 2020 and February 2023. (*Id.* at 2-3.) Plaintiff has lived in Pima County since late 2023, and prior to that lived in Oklahoma City, Oklahoma. (*Id.*)

On September 23, 2024, Canadian Running Magazine published an article entitled "U.S. Ultrarunner Camille Herron Involved in Wikipedia Controversy" ("the Article"). (Doc. 1-7 at 12.) To summarize, the Article claimed that email addresses associated with Plaintiff and her husband were linked to Wikipedia accounts that removed accolades and positive statements from the Wikipedia pages of Plaintiff's fellow ultrarunners while simultaneously adding similar content to Plaintiff's own Wikipedia page, in violation of Wikipedia policies. (Doc. 5-1.) Prior to the Article's publication, the writer responsible for it emailed Plaintiff to ask for a comment on its contents, and sent Plaintiff a Direct Message ("DM") on the platform Twitter/X advising Plaintiff that an email had been sent, without specifying the email's subject matter. (Doc. 1-7 at 20.) At the time the email and DM were sent, Plaintiff was in Greece competing in an ultramarathon; she saw the DM while in Greece, but did not interpret it as urgent and therefore did not immediately read the email. (*Id.* at 20-21.) Three days later, the Article was published without Plaintiff's comments or input. (*Id.*)

The Article quickly spread around the ultrarunning community and was further amplified by wider news sources, with publications such as Athletics Illustrated, Runner's World, Women's Health, Yahoo! Sports, and MSN reporting on Canadian Running Magazine's piece. (Doc. 1-7 at 22-23.) In 2022, Plaintiff had entered into a sponsorship agreement with sports apparel company Lululemon; on September 25, 2024—two days after publication of the Article—Lululemon notified Plaintiff that it was terminating their agreement. (*Id.* at 26.) Lululemon issued a public statement asserting that it was parting ways with Plaintiff due to a "difference in values." (*Id.*) Plaintiff alleges that in addition to the loss of income from her sponsorship agreement, her mental health and ability to train have been devastated by the Article's damage to her reputation in the ultrarunning

community.[1] (*Id.* at 30.)

Plaintiff brings one count of defamation and one count of intentional interference with business contract and expectancies arising from the foregoing events. (*Id.* at 31-32.) Defendant has moved to dismiss Plaintiff's suit pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), and pursuant to A.R.S. § 12-751, Arizona's law regarding strategic actions against public participation. (Doc. 5 at 1.) Defendant argues that this Court lacks personal jurisdiction over it, that Plaintiff has failed to state a claim upon which relief can be granted, and that Plaintiff filed this action only to interfere with Defendant's exercise of its First Amendment right to freedom of speech. (*Id.* at 1-2.)

## II. Personal Jurisdiction

### a. Standard of Review

Federal Rule of Civil Procedure 12(b)(2) allows a court to dismiss a complaint for lack of personal jurisdiction. When a defendant moves to dismiss under Rule 12(b)(2), "the plaintiff bears the burden of demonstrating that jurisdiction is appropriate." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). "The Court may consider evidence presented in affidavits and declarations in determining personal jurisdiction." *Apple Inc. v. Allan & Assocs. Ltd.*, 445 F. Supp. 3d 42, 50 (N.D. Cal. Mar. 27, 2020). If a Rule 12(b)(2) "motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Schwarzenegger*, 374 F.3d at 800 (internal quotation marks omitted). A plaintiff cannot "simply rest on the bare allegations of its complaint," *id.*, and the Court may not assume the truth of any allegations in the complaint that are contradicted by affidavit, *Apple Inc.*, 445 F. Supp. 3d at 50. However, uncontroverted allegations in the complaint are taken as true, and conflicts between the parties "over statements contained in affidavits must be

[1] Plaintiff emphasizes that she has AuDHD—co-occurring autism and attention-deficit/hyperactivity disorder (Doc. 1-7 at 4)—and that her AuDHD has greatly increased the stress she experiences as a result of the Article (*id.* at 30). She also alleges that her AuDHD manifests as a need for "rigid" rule adherence and a "high level of justice sensitivity," which has led to some disagreements between herself and other members of the ultrarunning community. (*Id.* at 4-8.) She asserts that the Article quoted an individual known to have had heated conflicts with Plaintiff in the past without verifying the individual's statements. (*Id.* at 15.)

resolved in the plaintiff's favor." *Schwarzenegger*, 374 F.3d at 800.

**b. Discussion**

Where a federal district court sits in diversity, it must apply the personal jurisdiction laws of the state in which it sits. Fed. R. Civ. P. 4(k)(1)(A); *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). "Arizona's long-arm statute allows Arizona courts to exercise personal jurisdiction over non-resident defendants 'to the maximum extent permitted under the Due Process Clause of the United States Constitution.'" *Luxury Auto Collection LLC v. Walker*, No. CV-21-02025-PHX-SRB, 2022 WL 17361292 at *2 (D. Ariz. July 6, 2022) (citing *High Purity D.R.A.W. Inc. v. Sanveo, Inc.*, No. 2:17-cv-1784-HRH, 2017 WL 4652203, at *2 (D. Ariz. Oct. 17, 2017)); Ariz. R. Civ. P. 4.2. For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have "certain minimum contacts" with Arizona "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1223 (9th Cir. 2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)).

A nonresident corporation may be subject to either general jurisdiction—allowing a court to hear any claim against a defendant due to ties rendering it "essentially at home" in the forum state—or specific jurisdiction. *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750 (9th Cir. 2025). Here, Plaintiff does not argue that Defendant's ties with Arizona are such that it is subject to general jurisdiction in this state. (*See* Doc. 10 at 5.) The parties contest only whether Defendant is subject to specific jurisdiction. (Docs. 5, 10, 11.) The following three-prong test governs whether specific jurisdiction exists over a non-resident defendant: "(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Schwarzenegger*, 374 F.3d at 802 (*quoting Lake v. Lake*, 817 F.2d 1416 (9th Cir. 1987)).

In cases involving tortious conduct, such as defamation, courts most often employ a "purposeful direction" analysis when evaluating the first prong of the specific jurisdiction test. *Mavrix*, 647 F.3d at 1228; *Gordy v. Daily News, L.P.*, 95 F.3d 829, 832 (9th Cir. 1996), *as amended* (Oct. 28, 1996). The purposeful direction analysis—or "*Calder* effects test"—requires that the defendant: (1) commit an "intentional act," that is (2) "expressly aimed at the forum state," and (3) which causes "harm that the defendant knows is likely to be suffered in the forum state." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1206 (9th Cir. 2006) (discussing *Calder v. Jones*, 465 U.S. 783 (1984)). The brunt of the harm need not be suffered in the forum state. *Id.* at 1207. Here, Defendant does not contest the existence of the first element of the *Calder* test (*see* Docs. 5, 11), and it is consistent with prior cases that publishing an article constitutes an intentional act. *See Xcentric Ventures, LLC v. Bird*, 683 F. Supp. 2d 1068 (D. Ariz. 2010) (publishing an article online is an intentional act); *Gordy*, 95 F.3d 829 (publishing an article in print is an intentional act).

Accordingly, the Court turns to the second element, the "express aiming" requirement, which is the focus of the bulk of the parties' arguments regarding personal jurisdiction. When conducting a purposeful direction analysis, a court must consider all of a defendant's contacts with the forum state, not merely those alleged to be wrongful. *Yahoo!*, 433 F.3d at 1208. Moreover, express aiming does not require differential targeting of a forum state, or a "forum-specific focus"; "the Supreme Court has considered and rejected the argument that because a nationwide company is everywhere, it is jurisdictionally nowhere except in its principal place of business and state of incorporation." *Briskin*, 135 F.4th at 757 (citing *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351 (2021)). In *Briskin*, the court concluded that a corporation had expressly aimed conduct at California despite the fact that only 8% of the merchants it had contracts with worldwide were located in California. *Id.*

In *Calder*, the case giving rise to the modern purposeful direction analysis, the Court

held that a Florida-based newspaper that printed an article allegedly defaming a California resident was subject to personal jurisdiction in California. 465 U.S. at 791. The Court reasoned that "California [wa]s the focal point both of the story and of the harm suffered" because the story was written about the plaintiff's activities in California, and the defendants caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the state. *Id.* at 789. The Court later elaborated that "[t]he crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff. The strength of that connection was largely a function of the nature of the libel tort[;]" since "publication to third persons is a necessary element of libel . . . the defendants' intentional tort actually occurred in California." *Walden v. Fiore*, 571 U.S. 277, 287 (2014).

However, material placed on the Internet, despite its "universal accessibility," is not "expressly aimed at every state in which it is accessed." *Mavrix*, 647 F.3d at 1231. "[T]he Ninth Circuit has consistently held that passive website activity must be accompanied by 'something more' in order to confer jurisdiction in a particular forum." *Cornelius v. DeLuca*, 709 F. Supp. 2d 1003, 1012 (D. Idaho 2010); *compare Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir. 1997) (holding that Arizona court could not exercise personal jurisdiction over Florida corporation where no contacts existed with Arizona other than maintaining a web page accessible to anyone over the Internet) *with Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085 (9th Cir. 2023) (holding that selling a product via interactive website and causing it to be delivered to a forum constitutes express aiming at that forum).

Courts often find that a corporation has expressly aimed its Internet activity at a forum state when it has entered into an economic relationship with forum residents. *See, e.g., Mavrix*, 647 F.3d at 1230; *Briskin*, 135 F.4th at 755-56. In *Mavrix*, the court held that a corporation operating a website focused on celebrity gossip had engaged in express aiming at California because many advertisements on the website were specifically directed to Californians, and because the website had a focus on the California-centered

entertainment industry. *Mavrix*, 647 F.3d at 1230. The court reasoned that "[t]he fact that the advertisements targeted California residents indicates that [the corporation] knows—either actually or constructively—about its California user base, and that it exploits that base for commercial gain by selling space on its website for advertisements." *Id.* In *Briskin*—though involving very different facts—the court once again focused on a corporation's extraction of profit from its relationship with the residents of a forum state, which was again, California. *Briskin*, 135 F.4th at 755-56. The *Briskin* court held that the defendant, which operated a website facilitating the sale of products online, had expressly aimed conduct at California consumers "through its extraction, maintenance, and commercial distribution of the California consumers' personal data." *Id.* at 756.

Merely posting an allegedly defamatory article or statement online with knowledge of an individual's residence does not constitute the "something more" that is required to establish express aiming. *Amini v. Bezsheiko*, No. CV-19-02601-PHX-SMB, 2020 WL 1911212 (D. Ariz. Apr. 20, 2020); *Xcentric Ventures, LLC v. Bird*, 683 F. Supp. 2d 1068 (D. Ariz. 2010). In both *Amini* and *Xcentric*, the court reasoned that an intentional tort, coupled only with knowledge of the plaintiff's residence, was insufficient to show a meaningful connection to the state where the plaintiff lived. *Id.* Similarly, one Circuit Court has held that Connecticut-based newspapers that published articles online referencing a Virginia resident were not subject to personal jurisdiction in Virginia despite the fact that the articles were accessible in Virginia, and the primary effects of defamatory statements would be felt in Virginia. *Young v. New Haven Advoc.*, 315 F.3d 256, 261-64 (4th Cir. 2002); *see also Shrader v. Biddinger*, 633 F.3d 1235, 1241 (10th Cir. 2011) ("[P]osting allegedly defamatory comments or information on an internet site does not, without more, subject the poster to personal jurisdiction wherever the posting could be read (and the subject of the posting may reside).").

Even engaging in "remote communications with a plaintiff residing in the forum state do[es] not constitute 'express aiming,' particularly where the defendant 'never visited the forum state' or 'performed any relevant duties in the forum state.'" *Beauchamp v.*

*Muise*, No. CV-24-00861-PHX-GMS, 2024 WL 4364058 at *3 (D. Ariz. Oct. 1, 2024); *see also Walden*, 571 U.S. at 286 ("[A] defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction . . . Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the "random, fortuitous, or attenuated" contacts he makes by interacting with other persons affiliated with the State.").

Here, Plaintiff proffers a declaration in which she describes five examples of email interactions with Defendant's editor between January 2020 and February 2023. (Doc. 10-1 at 2.) She avers that the Article "quoted, tagged, and referenced multiple Arizona-connected athletes and figures,"[2] and describes being unfollowed on Instagram by "Aravaipa Running, the most prominent trail-running company in Arizona, and its owner/CEO" following publication of the Article. (*Id.* at 4.) Plaintiff further avers that various publications by Defendant "routinely feature Arizona athletes, Arizona geography, and Arizona-based events and businesses," and that searching "Arizona" in Canadian Running Magazine returns "dozens to hundreds of pages of Arizona-related articles." (*Id.* at 4.) Finally, she states that the harm caused by the Article has been felt in Arizona because Arizona is where she resides, trains, and conducts the business of her professional career. (*Id.* at 5.) In reply, Defendant points out that Plaintiff's own declaration demonstrates that most of Defendant's communications with Plaintiff actually took place before she was an Arizona resident, since she only moved to Arizona in late 2023. (Doc. 11 at 4.) Defendant also argues that the mere fact that Plaintiff's Twitter/X account displayed her residence as Tucson, Arizona cannot support the conclusion that Defendant was aware that Plaintiff had moved to Arizona. (*Id.*)

Defendant argues that it has not expressly aimed any of its conduct at Arizona, and that the only connection between Defendant and this forum is that Plaintiff is an Arizona resident. (Doc. 5 at 8.) Defendant contends that reaching out to Plaintiff for her comment

[2] Despite Plaintiff's assertion that the Article referenced "Arizona-connected athletes," the Article does not mention the word "Arizona" or state that Plaintiff lives in Arizona. (Doc. 5-1.)

on the Article is insufficient to show express aiming at Arizona, and points out that Plaintiff was in Greece at the time Defendant contacted her.[3] (*Id.*) Plaintiff counters that the publication of the Article is part of a "decade-long pattern" of covering Plaintiff, contacting her in Arizona, and writing about her Arizona-based career. (Doc. 10 at 6.) Plaintiff further argues that her temporary absence from Arizona during the time Defendant contacted her does not destroy the connection between Defendant's actions and Arizona, and notes that the Twitter/X account through which Defendant contacted her displays her residence as Tucson, Arizona. (*Id.* at 9.)

The Court concludes that Plaintiff has failed to show that Defendant has expressly aimed its conduct at Arizona. Plaintiff argues that this case is directly comparable to *Calder*, but *Calder* is distinguishable in a fundamental respect. The defendant newspaper in *Calder* printed an article that was physically circulated in California; since the tort of libel requires publication to third parties, the tort actually occurred in California. In this case, Plaintiff premises the existence of jurisdiction solely on the online publication of the allegedly defamatory Article, and does not allege that any physical copies were distributed in Arizona. Given that mere accessibility of an online article in a forum state is not enough to show purposeful direction, the exercise of jurisdiction in this case requires the existence of "something more" to show that Defendant directed its activities toward Arizona.

"Something more" has not been demonstrated here. First, Plaintiff's argument that jurisdictionally significant contacts exist due to Defendant's prior articles featuring Arizona athletes, Arizona geography, and Arizona-based events and businesses is unavailing. While in *Mavrix*, for example, the defendant corporation's featuring of California-centered content was coupled with advertisements directed to Californians, no such economic targeting of an Arizona audience has been shown in this case. No evidence has been presented that Defendant profited from articles referencing Arizona, or even that anyone other than Plaintiff accessed these articles in Arizona. The same contrast exists

[3] Defendant was aware that Plaintiff was in Greece, as the DM sent to Plaintiff read: "Hi Camille, Hope you're enjoying Greece. We sent over an email you might be interested in. Please get back to us when you can. Best, Marley D[.]" (Doc. 1-7 at 20.)

between *Briskin* and the facts of this case; while in *Briskin* the defendant corporation's Internet interactions with Californians clearly gave rise to a source of profit, there is no indication here that Defendant interacted with Arizonans via the Internet, or that Defendant was in any kind of commercial relationship with Arizonans.

Next, in her response to Defendant's Motion to Dismiss and in her declaration, Plaintiff highlights Defendant's longtime history of communications with her.[4] In her response Plaintiff clarifies that she "does not rest jurisdiction on Defendant's communications with her . . . Defendant's communications to Plaintiff are additional evidence of Defendant's knowledge of Plaintiff's residency and its sustained course of dealing with this state; the Article itself is the jurisdictionally significant act." (Doc. 10 at 8.) Regardless of Plaintiff's framing of her jurisdictional theory, the Court notes that as in *Beauchamp*, mere remote communications between Plaintiff and Defendant are insufficient to show that Defendant has a connection with Arizona itself. As such, the Court finds it unnecessary to probe whether the fact that Plaintiff was in Greece when Defendant contacted her for the Article affects the jurisdictional analysis. Furthermore, even if Plaintiff could definitively prove that Defendant had knowledge of her residence, as in both *Amini* and *Xcentric Ventures*, this knowledge would still be insufficient to show that Defendant's conduct was expressly aimed at Arizona.

Since neither Defendant's prior articles referencing Arizona nor its communications with Plaintiff or alleged knowledge of Plaintiff's residence support a finding of express aiming, Plaintiff is left only with the fact of the Article's online publication to support her jurisdictional theory. Since material placed on the Internet, despite its "universal accessibility," is not "expressly aimed at every state in which it is accessed." *Mavrix*, 647 F.3d at 1231, Plaintiff has not succeeded in showing that Defendant has expressly aimed

---

[4] Plaintiff's own declaration shows that the majority of Defendant's communications with her took place before she moved to Arizona; she moved to Arizona in "late 2023," and the most recent example of an email exchange with Defendant's employees—besides the email sent prior to the publication of the Article at issue in this case—occurred in February 2023. (Doc. 10-1 at 2-3.) As discussed above, however, even if additional communications between Plaintiff and Defendant had occurred while Plaintiff resided in Arizona, this would still not be enough to show that Defendant had expressly aimed its conduct at Arizona.

its conduct at Arizona. As such, the Court need not address the third *Calder* element or the remaining two prongs of the specific personal jurisdiction test.

Accordingly,

**IT IS ORDERED** that Defendant's Motion to Dismiss (Doc. 5) is **granted**. This action is **dismissed without prejudice**.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to close this case.

Dated this 31st day of August, 2026.

Honorable Rosemary Márquez
United States District Judge